**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| GEORGIA M. GATHERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 3:07-cv-01488-PMD-JRM |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **ORDER** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

     Plaintiff Georgia M. Gathers ("Plaintiff" or "Gathers") brought this action to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Sections 205(g) and 1631(c)(3) of the Social Security Act. *See* 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). The record contains a Report and Recommendation ("R&R") of United States Magistrate Judge Joseph R. McCrorey, made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Rule 83.VII.02(A), recommending the adoption of the Commissioner's final decision denying Plaintiff's claims for DIB and SSI. Plaintiff timely objected to the Magistrate Judge's recommendation. *See* 28 U.S.C. § 636(b)(1) (providing that party may object, in writing, to a Magistrate Judge's R&R within ten days after being served with a copy). For the reasons stated herein, the decision of the ALJ denying Plaintiff DIB and SSI is affirmed.

**BACKGROUND**

     Plaintiff is a forty-nine year-old female with a high school education and past work experience as a cashier, security guard, custodian, housekeeper, laborer, and heavy equipment operator. On October 21, 2003, while at work as a cashier and sandwich maker at Crickett Express

in Moncks Corner, Plaintiff fell and injured her back.  The next day, on October 22, Plaintiff went

to the emergency room at Care Alliance Berkeley Hospital to seek treatment for severe back pain.

Doctor Glenn Freedman, M.D. examined Plaintiff and found that she had a decreased range of

motion.  Freedman diagnosed her with acute back pain and a lumbar contusion, and advised her to

take over the counter pain medication to treat her symptoms.

On November 5, 2003, Plaintiff was seen by Dr. Steven Poletti, M.D. ("Poletti"), at the

Southeastern Spine Institute.  In addition to back and leg pain, Poletti noted that Plaintiff was

experiencing dysesthesia, an unpleasant sensation of the skin, in both of her feet.  Poletti

recommended that Plaintiff not return to work until he had the opportunity to conduct an MRI and

discover the source and extent of Plaintiff's back problems.  Poletti ordered an MRI for Plaintiff,

which revealed a degenerative disc disease and several disc bulges.  Poletti ordered another MRI,

which revealed that Plaintiff had a spinal cord lesion.  In his report dated November 10, Poletti noted

these findings, hypothesized that they could have been caused by the workplace fall, and

recommended that Plaintiff seek treatment from a neurologist, referring her to Alton E. Bryant, M.D.

("Bryant") at the Carolina Neurological Clinic.  On December 31, 2003, Plaintiff filed for SSI and

DIB.

Bryant began treating Plaintiff on January 28, 2004.  Plaintiff was still experiencing severe

lower back pain.  Plaintiff also complained of urinary incontinence problems.  Bryant noted that

Plaintiff had below normal reflexes in her lower extremities, although her strength level and walk

were both normal.  Bryant also noted that Plaintiff had high blood-pressure, although Plaintiff

admitted that she had not been taking her prescribed blood pressure medication due to its high cost.

On a follow-up visit on March 15, Bryant diagnosed Plaintiff with a spinal lesion.

2

On April 8, 2004, Plaintiff went to the Franklin C. Fetter Health Center to resume general treatment care.[1]  Plaintiff was once again diagnosed with high blood pressure, and was told to resume taking her prescribed hypertension medication, go on a diet, and get regular exercise.  On a follow-up visit on April 19, Plaintiff's blood pressure had substantially improved.  The physician present at the April 8 visit also noted that Plaintiff suffered from severe back pain.

On April 12, 2004, Plaintiff was subject to a Physical Residual Functional Capacity Assessment pertaining to her pending claim for SSI and DIB.  The Assessment, given by a Dr. Charles Jones, M.D., found that Plaintiff could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could walk and/or stand approximately six hours out of an eight-hour workday, and could sit for approximately six hours out of an eight-hour workday.  The Assessment also found that Plaintiff was able to occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl.  The Assessment gave no other physical limitations on Plaintiff's occupational capabilities.

The following day, on April 13, 2004, the Social Security Administration determined that Plaintiff was not disabled, and therefore not entitled to DIB or SSI.  Also on April 13, a Vocational Analysis was issued that found that while Plaintiff did suffer from non-exertional impairments, the impairments would not prevent Plaintiff from performing her previous job of a bus driver as she had previously performed that position.  On April 14, the next day, the Social Security Administration sent Plaintiff a Notice of Disapproved Claims, explaining that:

> Medical evidence indicates that that [sic] you fell at work and injured back. While your back was being evaluated it was discovered that you had a spinal cord lesion.  These conditions cause you some discomfort and may cause some limitations

---

[1] Plaintiff had previously been treated at the facility, but had not been since May 2002.

in your ability to lift, carry, walk, and bend. You are also being treated for high blood pressure. However, your high blood pressure is being controlled with medication and does not significantly affect your ability to work.

You stated that you worked in the past as a school bus driver. The limitations caused by your condition, does [sic] not significantly affect your ability to do this type of work. Based on your description of this job, you can return to this type of work.

On May 4, 2004, Plaintiff went to see Dr. George B. Del Porto, M.D. ("Del Porto") for her urinary incontinence. Before her fall, Plaintiff had undergone a bladder neck elevation procedure. He noted that Plaintiff was obese, but stated that he believed Plaintiff's bladder neck[2] to be normal, although her bladder was not full at the time of her examination. Plaintiff exhibited no symptoms of urinary incontinence during the visit. On May 18, Plaintiff had a follow-up visit with Del Porto, at which time he performed a cytoscopy which showed normal bladder capacity. He did note that Plaintiff showed stress urinary incontinence when she coughed. He also noted that Plaintiff appeared to have a loss of the urethral vesical angle and a stenotic urethra, which he believed were most likely caused by Plaintiff's October 21 fall. Del Porto believed that Plaintiff's incontinence issues could be fixed by performing another surgical operation similar to the one Plaintiff had undergone prior to her fall, but recommended that Plaintiff lose at least 50 pounds before such a procedure was scheduled.

Shortly after seeing Del Porto, on May 25, 2004, Plaintiff filed a Disability Report Appeal. On this form, Plaintiff reported that: (a) her back pain had gotten worse since her initial filing for DIB and SSI; (b) she had experienced urinary incontinence, and had sought treatment from Del Porto for this condition; and (c) the increasing pain had made it very difficult for her to sleep regularly. Plaintiff also reported that she had continuously sought medical treatment for her various

---

[2] The bladder neck is the point at which the urethra and bladder are joined.

4

ailments since her initial disability claim, but that these had not alleviated her conditions. Plaintiff further noted that she could barely bathe and dress herself, and was able to do some housework, but that she no longer did much driving due to her ailments. On June 16, Plaintiff filed a formal Reconsideration Disability Report. On June 18, Plaintiff formally filed for reconsideration of the Administration's earlier determination that she was not disabled, reporting that:

> I am unable to work due to physical limitations resulting from disc abnormalities in my lumbar spine. My condition causes me to experience severe pain which radiates into my legs, and I am extremely limited with regard to my ability to stand, walk, sit, lift or engage in any physical activities.
> My ability to work is also limited due to urinary incontinence.

On August 3, 2004, Plaintiff was again seen by Bryant, who noted that her muscle strength, reflexes, and walk were all relatively good. Bryant ordered an MRI, which revealed a cystic defect in Plaintiff's spinal cord. Plaintiff again visited Bryant on November 3, at which time Bryant noted that Plaintiff had full strength and below normal reflexes in her lower extremities. Plaintiff again complained of severe lower back pain, and informed Bryant that it had gotten so bad that she could not even ride in a car without extreme discomfort. Bryant prescribed the prescription pain relievers Percocet and Darvocet for the treatment of Plaintiff's symptoms, and prescribed a lumbar support pillow for riding in the car. Bryant also referred her to see a neurosurgeon.

On August 16, 2004, Plaintiff underwent another Physical Residual Functional Capacity Assessment, this one conducted by a Dr. George Keller, M.D. Keller's assessment was materially identical to the one conducted by Jones four months before, finding that Plaintiff could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could walk and/or stand approximately six hours out of an eight-hour workday, and could sit for approximately six hours out of an eight-hour workday. The more recent Assessment also found, like the initial Assessment, that

5

Plaintiff was able to occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. On August 17, the Administration again determined that Plaintiff was not disabled, and therefore not entitled to DIB or SSI. On August 18, the Administration mailed Plaintiff a letter notifying her that it would not reconsider its earlier conclusion, since Plaintiff's ailments were not so severe as to be disabling, and that she could still perform the duties of a school bus driver, which was a position she had previously held.

On October 18, 2004, Plaintiff filed a Request for Hearing by an Administrative Law Judge, asserting identical claims as she had in her request for Reconsideration. On January 11, 2005, Administrative Law Judge Debra Morriss ("the ALJ") sent Plaintiff a letter, notifying her that a hearing on her claim had been scheduled for February 3, and giving her all pertinent information regarding the hearing. On that same date, the ALJ also sent a letter to Feryal Jubran ("Jubran"), a vocational expert, requesting that Jubran be present to testify at Plaintiff's hearing. On January 13, Plaintiff acknowledged receipt of the Notice of Hearing. On February 3, Plaintiff completed a form regarding the hearing. On this form, Plaintiff stated that she took the following medications:

1. Mobic, Darvocet, Lortab, Naproxen, Etodolac, Cyclobenzaprine, extra strength Tylenol, and Advil for the pain in her back and legs;
2. Norvasc and Accuretic for hypertension; and
3. Ambien for difficulty sleeping.

On February 1, 2005, Bryant completed a form regarding Plaintiff, at which he indicated that:

1. Plaintiff could only sit for 30 minutes at a time, and could only stand for 15 minutes at a time;
2. Several times a day, Plaintiff needs to lie down for 30-45 minutes;
3. Plaintiff could continue to be active at her current level;
4. If Plaintiff attempted to work, she would need several breaks and rest periods during the course of each day, which would occur on an unpredictable and irregular basis;

6

5.    Plaintiff was not capable of working a standard, 40 hour work week.

6.    If she did try to work, Plaintiff would miss more than 4 days of work per month due to her medical problems.

On February 3, 2005, Plaintiff's hearing was held before the ALJ. At the hearing, Plaintiff testified that she could barely dress herself, could not tie her shoes, and could not do most household chores. She also reported that she had difficulty speaking, remembering things, and keeping food down as a result of all the medication she took for her back pain. Plaintiff also asserted, that, as a result of the a pain, she was typically only able to get one to two hours of sleep per night, which dramatically impacted her ability to function and usually forced her to take naps during the day. She also said that she had been experiencing blurred vision, but conceded that she had not been to a doctor for this condition. Plaintiff also claimed that she experienced severe headaches which often forced her to lie down on her bed, and had bladder incontinence which required her to go to the restroom every 15 to 20 minutes.

At the hearing, Jubran also gave testimony as to the occupational limitations forced upon Plaintiff by her ailments. In Jubran's opinion, there were still several jobs that Plaintiff could perform. Jubran first testified that Plaintiff would be able to perform as a security guard, which requires a mixture of sitting and standing/walking, and little lifting and carrying.[3] Jubran went on to say that Plaintiff could also perform a number of manual jobs that were light in nature and did not require significant physical strength, such as office helper, ticket seller, and stock checker. Even if Plaintiff were adjudged to be sedentary, Jubran still reported that Plaintiff would be able to perform the duties of an inspector, a machine tender, or a sorter. Jubran further testified that

---

[3] Jubral offered that there were 2,088,000 security guard jobs in the nation, and 23,402 in the state of South Carolina. Jubral did note, however, that about half of these jobs would require the employee to climb an amount of stairs beyond Plaintiff's capabilities, so the actual number of those jobs that Plaintiff could perform was substantially less.

frequent bathroom breaks would generally not be a problem if Plaintiff maintained a good attitude and could keep up with the work the position demanded,, but that she did think it would be a problem if Plaintiff missed more than seven or eight days of work per year, or took unpredictable, periodic breaks to rest.  When the ALJ specifically asked Jubran if she believed Plaintiff could perform gainful employment if the ALJ found that Plaintiff had a deficit to consistent work performance of greater than 20 percent, Jubran estimated that Plaintiff could not.

Plaintiff next visited Bryant on February 7, 2005.  Bryant noted that she had undergone a bladder surgery, which helped her control her urinary incontinence.  Bryant also examined Plaintiff and found that she had full strength and below normal reflexes in her lower extremities, and that her ability to move fluidly was impaired by her pain, which was also interfering with her ability to sleep at night.  Plaintiff was prescribed additional medication and approved for a handicapped parking pass.

On March 1, 2005, Plaintiff visited Worthington, who gave her a generally positive diagnosis.  He reported that she did not need surgery on her spinal lesion, as she was responding "reasonably well" to clinical treatment.  He noted that she was strong and functioning, and that the bladder surgery had resolved her urinary incontinence problems.  Worthington did, however, observe that Plaintiff was still suffering from back pain.  He also noted that the Plaintiff's lesion was worsening, and that a fluid-filled cyst had appeared in Plaintiff's spinal cord.

Plaintiff was again seen by Bryant on July 11, 2005.  At this time, Bryant noted that Plaintiff was once again in severe back pain, but that the cause of the pain was the injury from her fall, not the lesion.  He noted that while Plaintiff was experiencing a limitation in her range of motion ("ROM") due to the back pain, her strength remained good, and that she reported that the bladder

surgery had dramatically improved her bladder functioning. Bryant prescribed valium for Plaintiff's back pain, and informed her that she should cease taking the previously-prescribed Kadian.

On July 13, 2005, Plaintiff was again examined by Poletti. He, too, noted that the bladder procedure had resolved Plaintiff's incontinence problems. Poletti believed that Plaintiff had a syrinx, which is a type of cavity or cyst, in the spinal cord. He also noted that the bulging disc was responsible for a ten percent impairment. Poletti further noted that the combination of the bulging disc, the lesion, and the syrinx could result in a more than thirty percent impairment in Plaintiff's functionality, which would make her eligible for disability benefits. Poletti did qualify this, however, by noting that he could not make this determination with any reasonable degree of medical certainty, and that such a determination should be rendered by Worthington and a Dr. Patel, who had previously examined Plaintiff and were more familiar with these types of spinal conditions. He went on to say that Plaintiff should avoid any repetitive physical or exertional activity, which he believed could exacerbate Plaintiff's possible syrinx problem.

On November 23, 2005, the ALJ issued a written opinion which determined that Plaintiff was not disabled as that term is defined by the Social Security Act. The ALJ first undertook a thorough recitation of the facts surrounding Plaintiff's claim, including the medical treatment sought by Plaintiff after the February 3 hearing.

The ALJ then made a credibility determination as to Plaintiff's disability claims, and in doing so, compared the claims made by Plaintiff to the medical evidence in the reports of the physicians who had treated her. After doing so, the ALJ found "that the claimant's allegations have been inconsistent with the medical evidence of record, the claimant's reports to her physicians, and the treatment sought and received." The ALJ noted:

9

While the claimant testified that she continued to suffer urinary incontinence and had to use the restroom every 15 to 20 minutes, medical treatment notes reveal that she underwent successful bladder surgery in February 2005 with resolution of her incontinence. Although the claimant has testified as to significant sleeping problems, the claimant has apparently failed to complain of such severe sleeping difficulties to any of her treating physicians. While she has stated that she received only 1 or 2 hours of sleep per night, no excessive daytime somnolence was ever noted upon examination.

The undersigned also notes that the claimant has testified that she suffered from difficulty dressing herself and performing housework, and has complained of significant side effects from her medications, including forgetfulness, slurred speech, and nausea. Again, after a thorough review of the evidence in the record, the medical evidence suggests that the claimant did not apparently complain to any of her treating physicians of such significant limitations. A failure to seek treatment for such allegedly significant symptoms further reduces the claimant's credibility. The undersigned notes that upon examination, the claimant was not found to have any significant physical limitations in moving about and was not diagnosed with any memory impairment or slurred speech. Despite her allegations at her hearing, the claimant also failed to seek out any medical treatment for her complaints of blurred vision. The claimant's testimony regarding the severity of her headaches is noted to be extremely inconsistent with the limited complaints she made to her treating physicians regarding her headaches. While the claimant complained of financial difficulties which restricted her access to medical care, the undersigned is aware of several low cost to no cost medical treatment alternatives located in the claimant's surrounding community. There is no medical evidence to suggest that the claimant ever attempted to avail herself of such services, despite her complaints of such severe functional limitations and pain.

Finally, the undersigned notes that the claimant has been noncompliant with her medication regimen. Specifically, the claimant has failed on several occasions to take her hypertension medications as directed and has not lost weight as directed by several physicians.

Based on this, the ALJ found that Plaintiff's degenerative disc disease, thoracic intermedullary lesion, and obesity constitute "severe" impairments under the law. Plaintiff's hypertension, possible (but never diagnosed) multiple sclerosis, and urinary incontinence did not constitute "severe" impairments under the law. The ALJ then examined all the evidence, and determined that Plaintiff's ailments, did not, either individually or in conjunction with one another, render her completely disabled.

10

In making this determination, the ALJ considered the Residual Functional Capacity Assessments, which both found that Plaintiff was still capable of performing significant sedentary work. In addition to considering the results of the various medical tests undergone by Plaintiff, the ALJ also considered the opinions of Plaintiff's two treating physicians, Bryant and Poletti, both of whom believed that Plaintiff was unable to work. However, the ALJ found that these opinions were unsupported by the weight of the medical evidence. Poletti's opinion was based in substantial part on his belief that Plaintiff suffered from what he believed to be a disabling syrinx, which a subsequent MRI showed that Plaintiff did not have. Furthermore, Poletti explicitly noted that he was not an expert in such neurological matters. The ALJ gave the greatest weight to Worthington, the neurosurgeon, who subjected Plaintiff to a series of objective tests and found that she was performing well and did not require surgery. This directly contradicts Bryant's opinion as to Plaintiff's disability.

Having determined that Plaintiff was not disabled, the ALJ then sought to determine what sort of occupation Plaintiff would be able to perform. The ALJ found that while Plaintiff would be unable to perform any of the same jobs she had previously held,[4] and was restricted to sedentary work, there were jobs in the economy which she could perform. In making this determination, the ALJ relied almost exclusively upon the opinions of Jubran given at the hearing.

Plaintiff sought a review of the ALJ's determination on January 17, 2006, but the Appeals Council denied this request on March 29, 2007, making the Commissioner's final decision that Plaintiff was not completely disabled, and therefore not entitled to DIB or SSI.

---

[4] While it had come up at various stages of the administrative proceedings that Plaintiff was at one time a school bus driver, "past relevant work" for the purposes of the disability finding generally must have been performed within the previous 15 years, and Plaintiff had not been employed as a school bus driver since the 1970s.

11

On May 25, 2007, Plaintiff filed the present action against the Commissioner in this court, asserting that the ALJ's decision had been erroneous and was not supported by substantial medical evidence.  Specifically, Plaintiff alleged that (1) the ALJ erred in her findings regarding Plaintiff's residual functional capacity; (2) the ALJ did not give Plaintiff's treating physicians' opinions the proper amount of deference; and (3) the ALJ erred in relying upon the testimony of the Jubran in determining that Plaintiff was able to perform in a number of jobs that exist in the local and national economy.  The matter was referred to the Magistrate Judge, who issued an R&R on July 9, 2008.

With regard to the ALJ's determination that Plaintiff had the residual functional capacity to perform a significant amount of sedentary work, the Magistrate Judge found that this decision was supported by substantial evidence.  The Magistrate Judge also found that the ALJ properly gave "great weight" to the opinion's of Plaintiff's treating physicians.  Finally, the Magistrate judge found that the ALJ was justified in relying upon the testimony of Jubran in determining which occupations Plaintiff could perform.

On July 28, Plaintiff filed timely Objections to the Magistrate Judge's R&R, to which the Commissioner filed a Reply on August 11.

## **STANDARD OF REVIEW**

### I.     **Magistrate Judge's R & R**

The Magistrate Judge makes only a recommendation to the court.  The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court.  *Mathews v. Weber*, 423 U.S. 261, 269 (1976).  The court reviews *de novo* those portions of the R&R to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate

Judge with instructions.  28 U.S.C. § 636(b)(1).  The court has reviewed the entire record, including the R&R and the Plaintiff's objections.  Pursuant to this review, the court concludes that the Magistrate made accurate recommendations to this court and applied the correct principles of law to this case.  Accordingly, the R&R is adopted in full and specifically adopted into this Order.

## II.     Commissioner's Final Determinations

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one.  Section 205(g) of the Act provides, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied."  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  The phrase "substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  In assessing whether there is substantial evidence, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency.  *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original).

13

## DISCUSSION

I.  **Commissioner's Determination that Plaintiff Had Residual Functional Capacity to Perform Sedentary Work**

Plaintiff objects to the Magistrate Judge's finding that the ALJ did not err in determining that Plaintiff has the residual functional capacity to perform a significant amount of sedentary work. Specifically, Plaintiff asserts that the opinions of Poletti and Bryant, her two treating physicians, make it clear that she could not perform the type of sedentary work proposed by the ALJ. Therefore, this court must determine whether there was substantial evidence to support the ALJ's finding.

Plaintiff is correct that Poletti's diagnosis did not support a finding that Plaintiff could perform a significant amount of repetitive work. Poletti opined that Plaintiff should avoid "constant sitting, bending, twisting, pushing, no heavy lifting." Furthermore, Poletti believed Plaintiff should avoid "any type of repetitive activity, any type of exertional activity." Similarly, Bryant explicitly expressed his opinion that Plaintiff was incapable of working a normal forty-hour work week, saying that she would need to take several breaks to lie down each day.

However, there is also evidence in the record which tends to indicate that Plaintiff could perform a significant amount of sedentary work.

Plaintiff did suffer from hypertension, but the record indicates that when Plaintiff took the medicine prescribed to her for this condition, which she ceased to do on several occasions, this condition was under control and did not inhibit her functional capacity. Similarly, while Plaintiff did experience urinary incontinence symptoms, and asserted that she continued to experience these symptoms in her claim for DIB and SSI, the medical records indicate that her February 2005 bladder

surgery alleviated this problem.[5]  Finally, while Plaintiff was objectively obese, she did not suffer from sleep apnea, diabetes, or other ailments commonly associated with obesity, and consistently showed average strength and muscle tone in medical tests.

As for Plaintiff's back problems, the ALJ found that Plaintiff's degenerative disc disease and thoracic intramedullary lesion were severe impairments which limited her residual functional capacity to sedentary work with only occasional bending, kneeling, stooping, crouching, crawling, twisting, and climbing, as well as changes in sitting and standing and convenient restroom access. This conclusion was supported by Worthington, who reported that Plaintiff was responding to treatment well, was functioning relatively well, and did not require surgery.  It was clearly supported by two separate state-employed physicians who completed residual functional capacity evaluations based upon the medical reports and who both believed that Plaintiff could perform a significant amount of sedentary work.  Furthermore, Poletti's opinion regarding Plaintiff's residual functional capacity was based largely upon his opinion that she was suffering from a benign syrinx in her spine, which later tests showed not to be the case.  Bryant's opinion was substantially based upon Plaintiff's own reports of her symptoms and problems, as opposed to the medical testing undertaken by other physicians who did not believe Plaintiff to be completely disabled.

This court re-emphasizes that its task is not to make an original determination of whether Plaintiff is completely disabled or not.  The ALJ is in a structurally superior position than this court to make such judgments, as the ALJ has an intimate familiarity with the governing law and interacts with and observes the Plaintiff and vocational expert during the hearing.  *See also Owens ex rel. Metcalf v. Barnhart*, 444 F. Supp. 2d 485, 488 (D.S.C. 2006) (quoting *Mastro*, 270 F.3d at 176 ("In

---

[5] Both Worthington and Bryant reported that Plaintiff could control her bladder function after the surgery.

assessing whether there is substantial evidence, the reviewing court should not 'undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of'" the

agency.").  Here, the court must only determine whether the ALJ's decision was supported by

"substantial evidence," which has been defined as "evidence which a reasoning mind would accept

as sufficient to support a particular conclusion."  *Shively*, 739 F.2d at 989.  In the present case,

Plaintiff was examined and given objective tests by a neurosurgeon, who reported that she was

responding well to treatment and did not require surgery.  Two state-employed physicians also

determined that Plaintiff was not completely disabled.  On the other hand, Plaintiff's treating

physicians' opinions that she was disabled were largely based upon a diagnosis with turned out to

be incorrect, or on Plaintiff's own description of her symptoms, some of which may be subject to

legitimate doubts.  Given this, the court must hold that the ALJ's determination that Plaintiff was

not completely disabled was certainly supported by reasonable evidence.

## II.    Commissioner's Failure to Give Controlling Weight to Opinion of Plaintiff's Treating Physicians

Plaintiff also objects to the Magistrate Judge's recommendation that the ALJ did not err by

not giving controlling weight to the opinions of Bryant and Poletti.  As previously discussed, both

Bryant and Poletti were of the opinion that Plaintiff was disabled and was not able to perform the

range of sedentary work which the ALJ ultimately concluded that she was able to perform.

Objective medical facts and the opinions and diagnoses of the treating and examining doctors

constitute a major part of the proof to be considered in a disability case and may not be discounted

by the ALJ.  *See, e.g.*, *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987) (holding that treating

physician's opinion is entitled to great weight if not contradicted by persuasive evidence); *Mitchell*

*v. Schweiker*, 699 F.2d 185, 187 (4th Cir.1983) (stating that the treating physician's opinion is "entitled to great weight for it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time" and should be disregarded "only if there is persuasive contradictory evidence").  When evaluating the opinion of a treating physician, the ALJ must consider whether the opinion should be given controlling weight.  *See* 20 C.F.R. § 404.1527(d)(2).  Controlling weight is afforded where the opinion (1) is from a treating source; (2) is a medical opinion concerning the nature and severity of the plaintiff's impairment; and (3) is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  *See* S.S.R. 96-2p; 20 C.F.R. § 416.927 (emphasis added).  However, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir.1996); *see also Hunter*, 993 F.2d at 35 (noting that "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence.").

Far from ignoring the opinions of Bryant and Poletti, the ALJ in this case gave the opinions of Plaintiff's treating physicians a substantial amount of consideration.  In determining Plaintiff's residual functional capacity, the ALJ adopted almost the entirety of the functional limitations recommended by Bryant and Poletti.  The ALJ adopted Bryant's limitations regarding Plaintiff's need to switch between sitting and standing.  The ALJ similarly adopted Poletti's limitations regarding Plaintiff's inability to lift more than ten pounds occasionally, and to have a job which did not require her to bend or twist her upper body with any regularity.

However, on several key points, the ALJ differed from the treating physicians.  The ALJ did not adopt Bryant's findings that Plaintiff would need to take frequent 30-40 minute rest breaks

during the day, and would thus be unable to work in an ordinary job which required her to work for eight hours at a time. The ALJ also declined to adopt Poletti's finding that Plaintiff could not perform any lifting or exertional activity and could not work. This court, then, must determine whether the ALJ's failure to incorporate these findings was justified by the treating physicians' opinions being "inconsistent with other substantial evidence."

As previously discussed, Bryant's recommendation that Plaintiff was not able to work, and that Plaintiff needed to take extended periods of rest each day, does not appear to have been a product of any sort of objective test or evaluation on Bryant's part. In including this information in his reports and recommendations, Bryant was merely repeating what Plaintiff had told him. Similarly, Poletti's findings were based largely upon his mistaken belief that Plaintiff was suffering from a benign syrinx, and he even explicitly noted on his report that ultimate determinations of functional limitations should be made by physicians with an expertise in neurology that had experience dealing with similar cases.

Worthington's diagnosis is undeniably very different than Bryant's. Worthington, the neurosurgeon, reported that Plaintiff was responding well to clinical treatment, was functioning relatively well, and did not need surgery. He did not report any major limitations upon Plaintiff's residual functional capacity. So of the neurological specialists who examined Plaintiff, only one believed Plaintiff needed to take breaks to lie down multiple times each day, and this was based solely upon Plaintiff's own claims, not independent, objective medical testing. Furthermore, the two state-employed physicians, which examined Plaintiff's medical records and issued the Residual Functional Capacity Assessments, also concluded independently of one another that, while Plaintiff was severely impaired, she was still capable of performing a substantial range of sedentary work.

18

Given that the majority of physicians to have weighed in do not believe that Plaintiff requires substantial breaks from the least physically demanding of occupations multiple times each day in order to function, the court must conclude that there is "persuasive contrary evidence" to this claim, and that the ALJ was therefore justified in departing from the findings of Bryant on this point.

As for Poletti's finding that Plaintiff was completely disabled, the ALJ's decision not to give controlling weight to this finding is also supported by "persuasive contrary evidence." Poletti was clearly basing his finding, in large part, upon his belief that Plaintiff suffered from a syrinx. Later medical testing showed this belief to be objectively wrong. Poletti also explicitly conceded that he was not an expert in neurology, and ultimate determinations as to disability should be left to just such an expert. Given that Poletti acknowledged his lack of expertise in this particular field, and that his opinion was based upon what was later shown to be a misunderstanding as to the true nature of Plaintiff's troubles, the court concludes that this finding was "inconsistent with other substantial evidence," and that the ALJ was therefore justified in relying upon the opinions of other physicians on this point.

Accordingly, the ALJ was justified in differing from the opinions of Plaintiff's treating physicians in determining she has the residual functional capacity to perform a limited range of sedentary jobs.

## III.    Commissioner's Reliance Upon Vocational Expert's Testimony

Plaintiff lastly objects to the Magistrate Judge's recommendation that this court uphold the ALJ's determination that Plaintiff could perform several jobs within the economy in reliance upon Jubral's testimony at the hearing.

Plaintiff asserts that Jubral's testimony was plainly inaccurate and should not have been

19

relied upon by the ALJ in making her determination as to whether Plaintiff was capable of working or not.  Plaintiff claims that Jubral misidentified several of the jobs that she mentioned as possibilities for Plaintiff at the hearing.[6]  However, an examination of the transcript and the relevant occupational listings shows that Jubral did not misidentify any of these positions, she simply used more general or colloquial language when identifying them.  Since this was in no way misleading to the ALJ, this court rejects Plaintiff's assertion that this somehow undermines the credibility of Jubral's testimony.

Plaintiff also claims that Jubral's testimony was unreliable because it was given in response to a hypothetical which was itself fundamentally flawed.  The ALJ had initially asked Jubral:

> Assume an individual Ms. Gathers' age, education, and work history.  Please assume I find that person limited to light work as defined by the Commissioner of Social Security, that does not require more than occasional bending, stooping, kneeling, crouching, crawling, twisting, and climbing stairs.  The person could not have a job that requires climbing ropes, ladders, or scaffolding.  This person requires a sit/stand option, such that after 30 minutes of sitting, she can change position.  And after 15 minutes of standing, would be able to change position.  Given those limitations, in your opinion would this person be able to do any of the work that Ms. Gathers did.  Either as she performed it or as it is typically performed?

After Jubral gave testimony on occupations she believed Plaintiff could still perform given those limitations, the ALJ asked her, "[i]f I were to find that instead of a limitation to light work, this person was limited to sedentary work, in your opinion would there be jobs that such a person could do?"  Jubral responded that Plaintiff could still perform the jobs of inspector, machine tender, and sorter.  Jubral further testified that collectively among those three occupations, there are 2,700

---

[6] Jubral testified that an individual with such limitations could work as an "inspector," although the actual position listed under the identification number was "film touch up inspector." Jubral also testified that such an individual could work as a "machine tender," where the actual position listed was "coater, brake linings."  Finally, Jubral testified that such an individual could work as "sorter," where the actual position listed was "nut sorter."

positions in South Carolina and 546,000 positions nationally. As detailed above, the ALJ did ultimately find that Plaintiff suffered from numerous severe impairments, but was still able to perform a sedentary occupation, and was therefore not completely disabled, and not entitled to DIB or SSI, because she was capable of performing one of the occupations described by Jubral.

Plaintiff asserts that this finding by the ALJ was erroneous, since the hypothetical question was flawed in that Plaintiff claims she is not able to perform sedentary work. This is, in essence, a challenge not to Jubral's testimony, but to the ALJ's finding that Plaintiff was capable of sedentary labor. The court can only overturn such a finding by the ALJ if there is no "substantial evidence" to support such a finding. As previously explained, the ALJ's finding was based upon several pieces of credible medical evidence, such as the diagnosis of the neurosurgeon Worthington, the residual functional capacity findings of two separate state-employed physicians, and the lack of any objective medical tests or evidence to support Plaintiff's contention that she was incapable of performing sedentary work. Therefore, this court must once again hold that the Magistrate Judge applied the correct principles of law in recommending that this court uphold the ALJ's findings as being supported by substantial medical evidence.

Accordingly, the ALJ was justified in asking Jubral what types of jobs Plaintiff would be able to perform if she were adjudged to only be capable of sedentary work, and then later, after the ALJ had decided that Plaintiff was only capable of performing sedentary work, in relying upon Jubral's testimony as to Plaintiff's ability to work at several different widely-available occupations.

## CONCLUSION

After a careful examination of the record as a whole, the court concludes that the ALJ's decision to deny benefits was supported by substantial evidence. It is, therefore, **ORDERED**, for the foregoing reasons, that the Commissioner's denial of benefits is **AFFIRMED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**September 25, 2008.**